IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL D. COMPTON, | ) | CASE NO. 3:13CV00112 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL, | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Michael D. Compton ("Plaintiff" or "Compton") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for supplemental social security income ("SSI") for the time periods September 1, 2003, through February 28, 2006, and June 1, 2007, through November 18, 2011.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As discussed below, the ALJ found Compton to be capable of "light work " but included in the Residual Functional Capacity Assessment ("RFC") a sit at will option that is inconsistent with the regulatory definition of  "light work."  The ALJ also failed to explain why she did not account for the eye fatigue limitation found by Compton's treating physician for the time period beginning June 1, 2007.  Accordingly, the Commissioner's decision should be **REVERSED AND REMANDED.**

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

## I.  Procedural History

On January 28, 1999, Compton protectively applied for Supplemental Social Security Income ("SSI").  Tr. 78.  This application was granted initially on March 24, 1999, on the grounds that Compton's condition met Listing 6.02C[2] as of March 24, 1999.  Tr. 15, 78 (determination not in record).  On September 24, 2003, the Social Security Administration ("Agency") notified Compton that it had determined that his disability based on renal failure ceased on September 1, 2003, and he would no long be receiving SSI.  Tr. 128-129, 141-143. Compton requested reconsideration of that decision and, on May 5, 2004, the determination was upheld.  Tr. 15.  On reconsideration, the Agency determined that Compton's renal impairment did not meet or equal a 6.00 Listing because he had a successful kidney transplant in 2000 and his current renal functioning was satisfactory.  Tr. 154.  Further, the Agency determined that Compton's vision problems did not meet or equal a 2.00 Listing because he has at least a 20/50 corrected visual acuity in his better eye.  Tr. 154.

---

[2] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

Listing 6.02 relates to impairment of renal function due to any chronic renal disease that has lasted or can be expected to last for a continuous period of at least 12 months. Subsection C requires:

Persistent elevation of serum creatinine to 4 mg per deciliter (dL) (100 ml) or greater or reduction of creatinine clearance to 20 ml per minute or less, over at least 3 months, with one of the following: 1. Renal osteodystrophy (see 6.00E3) manifested by severe bone pain and appropriate medically acceptable imaging demonstrating abnormalities such as osteitis fibrosa, significant osteoporosis, osteomalacia, or pathologic fractures; or 2. Persistent motor or sensory neuropathy (see 6.00E4); or3. Persistent fluid overload syndrome with: a. Diastolic hypertension greater than or equal to diastolic blood pressure of 110 mm Hg; or b. Persistent signs of vascular congestion despite prescribed therapy (see 6.00B5); or 4. Persistent anorexia with weight loss determined by body mass index (BMI) of less than 18.0, calculated on at least two evaluations at least 30 days apart within a consecutive 6–month period (see 5.00G2).

20 C.F.R. § 404, Subpt., App. 1.

**A.  First Hearing - 2006**

Compton requested a hearing and, on April 28, 2006, a hearing was held before Administrative Law Judge ("ALJ") Nino A. Sferella.  Tr. 15.  On September 25, 2006, ALJ Sferella issued a decision[3] affirming the determination that Compton's disability ceased on September 1, 2003.  Tr. 15.   On July 25, 2007, the Appeals Council vacated that decision and remanded the case for a supplemental hearing before a different ALJ on the basis of additional medical evidence submitted by Compton during the course of the appeal that indicated he had an aortic valve replacement on August 2, 2006.  Tr. 15.  The Appeals Council found that the ALJ incorrectly based his decision on Compton's condition through the date of cessation, September 1, 2003, and not through the date of the ALJ's decision, September 25, 2006.  Tr. 403.

On December 8, 2006, Compton filed a new application for SSI.  Tr. 15.  That application was denied initially on May 14, 2007.  Tr. 15.  The new application was associated with the remanded case (i.e. the initial claim) and was heard at the supplemental hearing held before ALJ Jeffrey A. Griesheimer on January 9, 2008, pursuant to the Appeals Council remand order.  Tr. 15, 78.

**B.  Second Hearing - 2008**

ALJ Griesheimer held the supplemental hearing on January 9, 2008, and issued a decision on February 12, 2008, affirming the determination that Compton's disability ceased on September 1, 2003.  Tr. 78.  However, Judge Griesheimer found that, Compton again became disabled on March 1, 2006, and remained disabled through May 31, 2007.  Tr. 91.  Judge Griesheimer further found that, as of June 1, 2007, Compton's disability again ceased and he did not have an impairment or combination of impairments that met or equaled the level of severity described in the Listings.  Tr. 93

---

[3] The September 25, 2006, decision is not in the record.

3

Compton requested review of Griesheimer's decision by the Appeals Council.  Tr. 102.

In an order dated May 14, 2010, the Appeals Council affirmed the finding that the claimant was

disabled from March 1, 2006, through May 31, 2007, and vacated the hearing decision with

respect to the issue of disability from September 1, 2003, through February 28, 2006, and from

June 1, 2007, through the date of the decision. Tr. 51-54.  The Appeals Council remanded the

case and ordered the ALJ to:

> Obtain additional evidence concerning the claimant's physical impairments in order to
> complete the administrative record in accordance with the regulatory standard regarding
> consultative examinations and existing medical evidence (20 CFR 416.912-913).

> If necessary, obtain additional evidence from a medical expert to clarify the nature and
> severity of the claimant's impairments (20 CFR 416.927(f) and Social Security Ruling
> 96-6p).

> Correct the finding of residual functional capacity for the period when the claimant was
> found disabled so that it is consistent with the opinion of the medical expert and, for the
> other periods at issue, give further consideration to the claimant's maximum residual
> functional capacity and provide appropriate rationale with specific references to evidence
> of record in support of the assessed limitation (20 CFL 416.945 and Social Security
> Ruling 96-8p).

> Obtain supplemental evidence from a vocational expert to clarify the effect of the
> assessed limitations on the claimant's occupational base.

> Offer the claimant opportunity for a hearing.

Tr. 16.

### C.  Third Hearing – 2011

On August 2, 2011, Compton appeared and testified at a hearing before ALJ Gabrielle J.

Vitellio.  Tr. 16.  Amy Kutschbach, an impartial vocational expert ("VE"), also appeared via

telephone.  Tr. 16.  In her November 18, 2011, decision (Tr. 15-42) the ALJ determined that

Compton's disability ended on September 1, 2003, and he remained "not disabled" through

February 28, 2006.  Tr. 30.  The ALJ further found that, from March 1, 2006, through May 31,

2007, Compton was under a disability as defined by the Social Security Act.  Tr. 32.  Beginning

June 1, 2007, the ALJ found that Compton's disability ended.  Tr. 33.

Compton requested review of the ALJ's decision by the Appeals Counsel.  Tr. 4.  On

November 15, 2012, the Appeals Council denied Compton's request for review, making the

ALJ's decision the final decision of the Commissioner.  Tr. 4.  In this case, Compton appeals

from that final decision denying his application with respect to the following time periods: (1)

September 1, 2003, through February, 28, 2006, and (2) June 1, 2007, through November 18,

2011, the date of the ALJ's decision.


## II. Evidence

### A.  Personal and Vocational Evidence

Compton was 47 at the time of the 2011 hearing before ALJ Vitellio.  Tr. 28, 552.

Compton reported that he was first diagnosed with diabetes at the age of 5.  Compton further

reported that he last worked selling boats from 1988 through 1998.  Tr. 22.  Compton stated

that he quit working in 1998 due to problems with diabetes.  Tr. 22.

### B.  Medical Evidence

#### a.  Medical Evidence Before September 1, 2003

**Visual Impairments.**  Dr. Jerald A. Bovino, an ophthalmologist, stated that Compton

underwent laser eye surgery eleven times from 1986 through 1989.  Tr. 82.  On June 4, 2002,

Compton treated with Dr. Nicholas Leonardy, an ophthalmologist, and was diagnosed with

diabetic retinopathy and mild cataracts in both eyes.  Tr. 23; 927.

**Renal Disease/Transplant.**  In 1999, Compton was diagnosed with end stage renal

disease.  Tr. 22.  On August 10, 2000, Compton underwent a kidney and pancreas transplant.  Tr.

22.  Compton subsequently experienced two episodes of rejection on September 2, 2000, and September 23, 2000.  Tr. 22.  Compton also experienced a duodenal stump leak on July 5, 2001, that required hospitalization for ten days.  Tr. 23.

Compton received post-transplant follow up care from Dr. Ronald Pelletier at the Ohio State University Medical Center.  Tr. 23.  On February 11, 2002, Pelletier stated that Compton reported no complaints and that overall Compton was doing very well (i.e. he had a baseline creatine of 1.8 to 1.9; his blood sugars were well-controlled; and his immunosuppressant medication was decreased).  Tr. 23.

### b.  Medical Evidence from September 1, 2003, though February 28, 2006.

**Visual Impairments.**  On April 7, 2004, Dr. Jack Hendershot, ophthalmologist, stated that, "[Compton's] visual acuity would not allow a return to work at this time.  I am sure that the findings of today combined with a 31-year history of diabetes, have contributed to the overall changes in your visual acuity that you experience on a day-to-day basis."  Tr. 90, 1376.

On January 25, 2005, Dr. Leonardy stated that Compton's left eye had an increasingly prominent nuclear sclerotic and posterior subcapsular cataract that likely contributed to his symptoms of blurred vision.  Tr. 85.  On January 26, 2006, Compton told Dr. Leonardy that he had fluctuating vision, but no progressive vision loss.  Tr. 85.

**Renal Disease/Transplant.**  Compton treated with Dr. Pelletier on August 8, 2005.  Tr. 903.  Dr. Pelletier reported that Compton was five years post-transplantation surgery and, aside from an acute rejection and subsequent enteric conversion approximately one year post-transplant, Compton has had a fairly stable post-transplant course and had no specific complaints.  Tr. 903.

### c.  Medical Evidence from March 1, 2006, through May 31, 2007

**Cardiac Issues.**  On July 26, 2006, Compton presented with multiple syncope episodes associated with severe aortic stenosis.  Tr. 85.  On August 2, 2006, Compton underwent an aortic valve replacement with a prosthesis.  Tr. 85

### d.  Medical Evidence from June 1, 2007, through the date of the hearing

**Visual Impairment(s)**.  On June 24, 2007, Dr. Leonardy completed a vision functional capacity questionnaire.  Tr. 1425-1429.  Dr. Leonardy indicated that Compton could be expected to have easy eye fatigue and would need to rest his eyes frequently.  Tr. 1427.  Dr. Leonardy further indicated that Compton could have difficulty with fine details and/or reading but is not likely to have pain, redness, or watering of his eyes.  Tr. 1428-29.  Dr. Hendershot also completed a vision functional capacity questionnaire.  Tr. 1419-1423.  Dr. Hendershot stated that Compton would not have easy eye fatigue.  Tr. 1421.

On June 18, 2008, Compton reported to the emergency room due to sudden loss of central vision in the right eye.  Tr. 1538.  The emergency room thought the implant in his right eye had "fallen out of place" but Dr. Hendershot later found Compton had vitreous and pre-retinal hemorrhage in the right eye.  Tr. 1538.  Compton's vision was found to be 20/400 in the right eye and 20/25 in the left eye.  Tr. 1538.  Compton was referred to Dr. Charles K. Dabbs for urgent evaluation.  Tr. 1538.

On July 10, 2008, Compton reported to Dr. Dabbs.  Tr. 1535.  Dr. Dabbs stated that Compton's vision has cleared to 20/200 in the right eye and was 20/30 in the left eye following laser treatment for proliferative diabetic retinopathy.  Tr. 1535, 1538.  Dr. Dabbs noted that Compton had been complaining of transient changes in vision in his left eye but found Compton's visual changes "may be situational as he tries to read mostly with the left eye."  Tr.

1535.  Dr. Dabbs also found that Compton's left-eye cataract may also make it more and more difficult for him to read in the future, stating that he may benefit from cataract extraction with lens implantation.  Tr. 1535.  Dr. Dabbs also stated that Compton asked whether or not it would be safe for him to work or do some lifting.  Tr. 1536.  Compton told Dr. Dabbs that he has not had any new bleeding as the result of the work he has been doing around a marina.  Tr. 1536. Dr. Dabbs told him that it is unlikely that lifting or doing such work would contribute to any significant eye problems.  Tr. 1536.

On September 4, 2008, Compton returned to Dr. Dabbs who stated, "Mr. Compton's vision is compromised by the cataract in his left eye and the superior retinal ischemia in both eyes, and probably has some limitation of his peripheral vision fields secondary to retinal ischemia and laser photocoagulation treatment."  Tr. 1534.  On July 27, 2011, Dr. Hendershot wrote a "To Whom it May Concern" letter in which he stated that, "laser treatment permanently reduced [Compton's] night vision to essentially zero, and additionally limited his peripheral visual field to a central 30 degrees in eye.  He has had intermittent vitreous hemorrhages OU.  He also had transient obscurations of vision not related to vitreous hemorrhage…"  Tr. 1705.

**Cardiac Issues.**  On November 7, 2007, Compton saw Dr. Jerome F. Beekman, cardiologist, as a follow up to for his aortic valve replacement.  Tr. 34. Compton reported that, since his surgery, he had one episode of dizziness due to exertion that occurred pushing a cart up a hill.  Tr. 34.  Dr. Beekman noted that Compton was stable.  Tr. 34.

### C.  Testimonial Evidence

#### 1.      Compton's Testimony

Compton testified during the hearing on August 2, 2011, before ALJ Vitellio that he last worked selling boats in 1998.  Tr. 1766.  He stated that he stopped working at that time due to

problems with his diabetes.  Tr. 1797.  Compton testified to his lengthy health history but, for the periods in question for the third hearing,[4] testified that his main problem was his vision.  Tr. 1772.  Compton stated that he is losing vision and has very little peripheral vision.  Tr. 1787. Compton testified that he drives on days he's comfortable with his vision.  Tr. 1777.

Compton also testified that he bruises easily from taking the blood thinner Coumadin (Tr. 1780) and gets fatigued from his immunosuppressive therapy medications (Tr. 1782).  He also testified that he gets lightheaded and dizzy at times.  Tr. 1783.  Compton stated that he has swelling (edema) from his 2000 transplant and thinks his vision problems may be related to his edema.  Tr. 1789-1790.

### 2.    Vocational Expert's Testimony

Vocational Expert Amy Kutschbach ("VE") testified at the hearing.  Tr. 1793-1798.  The ALJ initially determined that Compton had no past relevant work.  Tr. 1793.  The ALJ then asked the VE to assume a younger individual, more than a high school education, at a reduced range of light work, who could lift 10 pounds, stand/walk six hours, with sitting at will, simple, routine tasks, no unprotected elevations, and no working with fine print.  Tr. 1793-94.  The VE testified such a hypothetical individual could perform unskilled light work such as a stock checker, wire cutter, and laundry worker.  Tr. 1794-95.  The VE clarified that it has been her observation that people employed in the stock checker position may sit at will.  Tr. 1794.

The ALJ then posed a second hypothetical and asked the VE to assume a younger individual, more than a high school education, sedentary work, simple, routine tasks, no unprotected elevations, no fine print.  Tr. 1795.  The VE testified such a hypothetical individual could perform unskilled sedentary work as a spotter, sorter, or final assembler.  Tr. 1795.

---

[4] September 1, 2003, through February, 28, 2006, and June 1, 2007, through the date of the ALJ's decision.

The VE was then questioned by Compton's attorney, who asked if any of the jobs she mentioned had any involvement with peripheral vision.  Tr. 1797.  The VE stated that, under the first hypothetical, the stock checker position would be the most likely to involve peripheral vision and that, under the second hypothetical, the only position including any peripheral vision would be the spotter.  Tr. 1797.  Because of Compton's prescription for Coumadin, Compton's attorney then asked if any of the jobs the VE mentioned involved moving machinery or dangerous or hazardous machinery.  Tr. 1798.  The VE responded that the most dangerous position would be the spotter.  Tr. 1798.

### III. Standard for Disability

#### A.  Initial Disability Determination

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making an initial determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations[5].  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## B.  Cessation of Benefits

When, as here, a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where he

---

[5] Compton's 2008 and 2011 ALJ hearings involved remands on his cessation of benefits.  Compton also filed a new application for SSI.  This claim was associated with the remanded case and heard before the ALJ in 2008 at the second hearing mentioned above.

is able to perform substantial gainful activity.  42 U.S.C. § 423(f)(1); *Kennedy v. Astrue,* 247 F. App'x 761, 764 (6th Cir. 2007)  Whether an individual's entitlement to benefits continues depends on whether "there has been any medical improvement in [the individual's] impairment(s) and, if so, whether this medical improvement is related to [the individual's] ability to work." 20 C .F.R. §§ 404.1594(b), 416.994(b).

The cessation evaluation process is a two-part process.  *See Kennedy,* 247 F. App'x at 764–65.  The first part of the process focuses on medical improvement.  *Id.* at 764.  The implementing regulations define "medical improvement" as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled."  *Id.* at 764–65 (citing 20 C.F.R. § 404.1594(b)(1)).  "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the individual's] impairment(s).... 20 C.F.R. §§ 404.1594(b)(1)(i), 416.994(b) (1)(i).  If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding 'increase in [the claimant's] functional capacity to do basic work activities....' "  *Kennedy,* 247 F. App'x at 765 (quoting 20 C.F.R. § 404.1594(b)(3)); s*ee also Nierzwick v. Commissioner of Social Security,* 7 F. App'x 358, 361 (6th Cir. 2001).

The second part of the cessation analysis focuses on whether the individual has the ability to engage in substantial gainful activity.  *Kennedy,* 247 F. App'x at 765.  The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations.  *Id.* (citing 20 C.F.R. § 404.1594(b)(5)

12

and (f)(7)).  The difference is that "the ultimate burden of proof lies with the Commissioner in

termination proceedings." *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan,*

940 F.2d 942, 944 (5th Cir. 1991)).  An increase in the claimant's functional capacity will lead to

a cessation of benefits only if, as a result of the increase, the claimant can perform his past work

or other work that exists in significant numbers in the national economy.  20 C.F.R. §§

404.1594(f)(7), (8), 416.994(f)(7), (8).

In deciding whether a recipient's entitlement to disability benefits has ended, the

Commissioner uses the eight-step[6] sequential evaluation process outlined in 20 C.F.R. §§

404.1594(f)(1)-(8) and 416.994(f)(1)-(8). *Kennedy,* 247 F. App'x at 764.  The steps are:

1.  Do you have an impairment or combination of impairments which meets or equals the
    severity of an impairment listed in appendix 1 of subpart P of part 404 of this
    chapter? If you do, your disability will be found to continue.

2.  If you do not, has there been medical improvement as defined in paragraph (b)(1)(i)
    of this section? If there has been medical improvement as shown by a decrease in
    medical severity, see step 3 in paragraph (b)(5)(iii) of this section. If there has been
    no decrease in medical severity, there has been no medical improvement. (See step 4
    in paragraph (b)(5)(iv) of this section.)

3.  If there has been medical improvement, we must determine whether it is related to
    your ability to do work in accordance with paragraphs (b)(1)(i) through (b)(1)(iv) of
    this section; i.e., whether or not there has been an increase in the residual functional
    capacity based on the impairment(s) that was present at the time of the most recent
    favorable medical determination. If medical improvement is not related to your ability
    to do work, see step 4 in paragraph (b)(5)(iv) of this section. If medical improvement
    is related to your ability to do work, see step 5 in paragraph (b)(5)(v) of this section.

4.  If we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no
    medical improvement or if we found at step 3 in paragraph (b)(5)(iii) of this section
    that the medical improvement is not related to your ability to work, we consider
    whether any of the exceptions in paragraphs (b)(3) and (b)(4) of this section apply. If
    none of them apply, your disability will be found to continue. If one of the first group
    of exceptions to medical improvement applies, see step 5 in paragraph (b)(5)(v) of
    this section. If an exception from the second group of exceptions to medical

---

[6] The ALJ stated that 20 CFR 416.994 is a seven-step evaluation process but seemed to combine steps one and two.
Tr. 16.

improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

5. If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function. If the residual functional capacity assessment in step 3 in paragraph (b)(5)(iii) of this section shows significant limitation of your ability to do basic work activities, see step 6 in paragraph (b)(5)(vi) of this section. When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

6. If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

7. If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (b)(5)(vi) of this section and your age, education, and past work experience (see paragraph (b)(5)(viii) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

8. We may proceed to the final step, described in paragraph (b)(5)(vii) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (b)(5)(vi) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (b)(5)(vi) of this section. If we find that you may be unable to adjust to other work or if § 416.962 may apply, we will assess your claim under paragraph (b)(5)(vi) of this section and make a finding about whether you can perform your past relevant work.

20 C.F.R. § 416.994.  There is no presumption of continuing disability. *Kennedy,* 247 F.

App'x at 764 (citing *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284,

286–287 n. 1 (6th Cir. 1994)). Instead, the Commissioner applies the above procedures to

determine whether the claimant's disability has ended and if he is now able to work. *Id.*

14

# IV. The ALJ's Decision

In her November 18, 2011, decision, the ALJ made the following findings[7]:

1.  The most recent favorable medical decision finding that the claimant was disabled is the determination dated March 24, 1999. This is known as the "comparison point decision" or CPD. Tr. 19.

2.  At the time of the CPD, the claimant was found to have a medically determinable impairment that met section(s) 6.02C of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d)). Tr. 19.

3.  The medical evidence establishes that, between September 1, 2003, and February 28, 2006, the claimant had the following medically determinable impairments: status post kidney and pancreas transplant on August, 10, 2000, diabetes mellitus with bilateral diabetic retinopathy, status post right eye cataract surgery, and depression. Tr. 19.

4.  Between September 1, 2003, and February 28, 2006, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926). Tr. 19.

5.  Medical improvement occurred as of September 1, 2003 (20 CFR 416.994(b)(1)(i)). Tr. 21.

6.  The medical improvement was related to the ability to work because, as of September 1, 2003, the claimant's CPD impairment(s) no longer met or equaled the same listing(s) that was met at the time of the CPD (20 CFR 416.994(b)(2)(iv)(A)). Tr. 21.

7.  Between September 1, 2003, and February 28, 2006, the claimant continued to have a severe impairment or combination of impairments (20 CFR 416.994(b)(5)(v)). Tr. 21.

8.  Between September 1, 2003, and February 28, 2006, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant was limited to lifting 10 pounds occasionally, standing/walking up to six hours with an option to sit at will, and no difficulty sitting in an eight-hour workday. The claimant was further limited to simple, routine tasks in an environment with no fine print and no unprotected elevations. Tr. 21.

---

[7] The numbers assigned to the ALJ's findings here are the same as those in the ALJ's decision.

9.      The claimant has no past relevant work (20 CFR 416.965).  Tr. 28.

10.     On September 1, 2003, the claimant was a younger individual age 18-49 (20 CFR 416.963).  Tr. 28.

11.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).  Tr. 28.

12.     Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 416.968).  Tr. 29.

13.     Between September 1, 2003, and February 28, 2006, considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 416.960(c)) and 416.966).  Tr. 29.

14.     The claimant's disability ended on September 1, 2003, and he remained "not disabled" through February 28, 2006 (20 CFR 416.994(b)(5)(vii)).  Tr. 30.

15.     The claimant has not engaged in substantial gainful activity since March 1, 2006, the date the claimant again became disabled (20 CFR 416.920(b) and 416.971 et seq.).  Tr. 30.

16.     From March 1, 2006, through May 31, 2007, the period during which the claimant was under a disability, the claimant had the following severe impairments:  status post kidney and pancreas transplant, diabetes mellitus with diabetic retinopathy, status post right eye cataract surgery, aortic stenosis post aortic valve replacement on August 2, 2006, with atypical chest pain, and depression (20 CFR 416.920(c)).  Tr. 30.[8]

17.     From March 1, 2006, through May 31, 2007, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).  Tr. 30.

18.     After careful consideration of the entire record, I found that, from March 1, 2006, through May 31, 2007, the claimant had the residual functional

---

[8] The ALJ found that Compton developed an additional severe impairment (aortic stenosis) around March 1, 2006. "The claimant reported in July 2006 that he experienced three episodes of syncope with the first occurring in March 2006.  The episodes of syncope were discovered to be connected to aortic stenosis, and the claimant underwent an aortic valve replacement with a prosthesis on August 2, 2006.  Thus, as of March 1, 2006, the claimant has had the medical determinable severe impairment of aortic stenosis.  As of August 2, 2006, the claimant has been status post aortic valve replacement with atypical chest pain."  Tr. 30.

capacity to lift and/or carry up to five pounds occasionally and three pounds frequently, and he could sit for a total of four hours in an eight-hour workday and stand/walk for a total of two hours in an eight-hour workday.  Thus, I find that the claimant could not perform sustained work on a regular and continuing basis from March 1, 2006, through May 31, 2007 (i.e., 8 hours a day for 5 days a week or an equivalent work schedule) (SSR 96-8p).  Tr. 31.

19.    The claimant still has no past relevant work (20 CFER 416.965).  Tr. 32.

20.    The claimant was a younger individual age 18-44 on March 1, 2006, the established disability onset date (20 CFR 416.963).  Tr. 32.

21.    The claimant still has at least a high school education and is able to communicate in English (20 CFR 416.964).  Tr. 32.

22.    Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).  Tr. 32.

23.    From March 1, 2006, through May 31, 2007, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 416.960(c) and 416.966).  Tr. 32.

24.    The claimant was under a disability, as defined by the Social Security Act, from March 1, 2006, through May 31, 2007 (20 CFR 416.920(g)).  Tr. 32.

25.    The claimant has not developed any new severe impairments since June 1, 2007, the date the claimant's disability ended.  Thus the claimant's current severe impairments are the same as that present from March 1 2006, through May 31, 2007.  Tr. 33

26.    Beginning June 1, 2007, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.994(b)(5)(i)).  Tr. 33.

27.    Medical improvement occurred as of June 1, 2007, the date the claimant's disability ended (20 CFR 416.994(b)(1)(i).  Tr. 34.

28.    The medical improvement that has occurred is related to the ability to work because there has been an increase in the claimant's residual functional capacity (20 CFR 416.994(b)(1)(iv)(A)).  Tr. 34.

29.  After careful consideration of the entire record, I find that, beginning June 1, 2007, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant is limited to lifting 10 pounds occasionally, standing and/or walking up to six hours with an option to sit at will, and no difficulty sitting in an eight-hour workday.  The claimant is further limited to simple, routine tasks in an environment with no fine print and no unprotected elevations.  Tr. 34.

30.  The claimant still has no past relevant work (20 CFR 416.965).  Tr. 40.

31.  Since June 1, 2007, the claimant's age category has changed to a young individual age 18-49 (20 CFR 416.963).  Tr. 40.

32.  The claimant's education level has not changed (20 CFR 416.964).  Tr. 40.

33.  Transferability of job skills is not an issue in this case because the claimant does not have past relevant work (20 CFR 416.968).  Tr. 40.

34.  Beginning June 1, 2007, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).  Tr. 41.

35.  The claimant's disability ended June 1, 2007 (20 CFR 416.994(b)(5)(vii)).  Tr. 41.

The ALJ's decision became the final decision of the Acting Commissioner when the Appeals Council confirmed it on November 15, 2012.  Tr. 4.


## V. Parties' Arguments

### A.  Plaintiff's Arguments

Plaintiff presents five issues for review.  First, Plaintiff argues that the ALJ's RFC findings Nos. 8 and 29, which were incorporated in the hypothetical presented to the VE at the third hearing, were not accurate nor were they supported by substantial evidence.  Doc. 16, p. 19.  Next, Plaintiff contends that the ALJ's determination that Plaintiff had no new impairments and/or increased severity of impairments after June 1, 2007, is not supported by substantial

evidence.  Doc. 16, p. 23.  Plaintiff further argues that the ALJ failed to accurately summarize facts in the record leading to distortion and a denial decision that was not supported by substantial evidence.  Doc. 16, p. 27.  Plaintiff also alleges that the ALJ failed properly to apply the treating physician rule and give Plaintiff's treating sources controlling weight.  Doc. 16, p. 28.  Finally, Plaintiff contends that the ALJ failed to allow Plaintiff the opportunity to fully cross-examine the VE thus denying Plaintiff due process of law.  Doc. 16, p. 29.

### B.    Defendant's Arguments

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that Compton experienced medical improvement and was able to perform other work as identified by the VE.  Doc. 17, p. 11.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ's RFC assessment is not supported by substantial evidence

Plaintiff argues that the RFC set forth in findings No. 8 and No. 29 of the ALJ's decision, quoted above, are inaccurate and unsupported by substantial evidence.  Doc. 16, pp. 19-20.  In both of those findings, the ALJ found that Compton had the residual capacity to perform light work, except that he was limited to lifting 10 pounds occasionally, standing/walking up to six hours with an option to sit at will, no difficulty sitting, limited to simple, routine tasks in an environment with no fine print and no unprotected elevations.  Tr. 21, Tr. 34.  Finding No. 8 applied this RFC to the period from September 1, 2003, to February 28, 2006.  Tr. 21.  Finding No. 29 applied this RFC to the period beginning June 1, 2007.  Tr. 34.  The ALJ incorporated these RFC findings in her hypothetical presented to the VE.

Essentially, Compton argues that the VE's opinion testimony in response to the hypothetical did not provide substantial evidence in support of the ALJ's decision because the hypothetical failed to accurately incorporate all of his limitations.  To support this contention, Compton asserts that the ALJ failed to include in the hypothetical (1) a limitation of no peripheral vision beyond 30 degrees and the ability to rest eyes frequently; (2) a limitation of no contact with machinery, sharp objects, dangerous or exposed heights, and uneven surfaces;[9] (3) a limitation of no close proximity to or work in coordination with employees and/or the general public; (4) the ability to sit at will,[10] and (5) the ability to elevate feet[11].  Doc. 16, p. 21.

In order for a VE's opinion testimony to constitute substantial evidence, the hypothetical presented to the VE must accurately portray the claimant's limitations.  *Ealy*, 594 F.3d at 516-17; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that,

---

[9] Compton is taking Coumadin (blood thinner).

[10] Compton argues that the ALJ's findings that he can stand/walk for 6-8 hours and also sit at will is inconsistent and requires more specificity.  Doc. 16, p. 20.

[11] Compton suffers from edema.

although an ALJ need not list a claimant's medical conditions, the hypothetical should provide

the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is

well established that an ALJ may pose hypothetical questions to a vocational expert and is

required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v.*

*Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

      **1.  Sit/Stand Issue**

      Compton argues that the ability to sit at will, which the ALJ included in her hypothetical,

does not set forth a proper sit/stand option.  SSR 96-9p.  Compton contends that the ALJ

incorporated inconsistent limitations in the RCF:  a sit at will limitation and a stand/walk for 6-8

hours limitation.  With regard to the sit/stand issue, the ALJ noted,

> [J]obs are classified in the DOT by exertional category (e.g., sedentary, light, etc.)
> without a provision for a sit/stand option.  I further notes (sic) that the DOT lists
> maximum requirements of occupations as generally performed, and that a vocational
> expert can provide testimony with consideration given to the range of requirements of
> particular jobs as they are performed (SSR 00-4p).  When the testimony of a vocational
> expert differs from the DOT, I may rely upon the vocational expert (*Conn. V. Secy. Of*
> *Health and Human Svcs.*, 51 F.3d 607, 610 (6th Cir. 1995).  In that regard, the expert
> relied on multiple job sources as well as personal experience and observation to reach the
> above-cited conclusions.

Tr. 29-30.

      The ALJ found Compton to be capable of work at the light exertional level.  The Social

Security regulation's definition of light work states, "The full range of light work requires

standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.

Sitting may occur intermittently during the remaining time."  SSR 83-10.  The ALJ's decision is

inconsistent with the definition in SSR 83-10 because, if Compton were limited to work

permitting him to sit at will, he would be able to sit longer than allowed under the definition of

light work.  The ALJ may have determined that Compton does not need to sit longer than 2

hours; however, the ALJ did not state that and this Court cannot guess at how the ALJ may have intended to resolve the inconsistency.  Thus, the Court is deprived of the ability to conduct meaningful judicial review of this determination.  Accordingly, the Commissioner's decision should be reversed and remanded for the purpose of clarifying the inconsistency between the definition of light work contained in SSR 83-10 and the RFC, which was incorporated in the VE hypothetical, and which limited Compton to work that allows him to sit at will.

### 2.  Visual Impairments

Compton argues that the ALJ failed to incorporate in her hypothetical and RFC findings (No. 8 and 29), the following limitations:   no peripheral vision beyond 30 degrees and the ability to rest eyes frequently.  Doc. 16, pp. 18-22.

**Eye Fatigue.**  In arguing that the ALJ failed to include the limitation of an ability to rest eyes at will for the time period from September 1, 2003, through February 28, 2006, Compton cites to a 2003 letter from his treating physician, Dr. Hendershot.  Doc. 16, p.22, Tr. 1378.  The letter states, "[Compton's] visual complaints relate to primarily bright light conditions.  He has difficultly with reading traffic signals, store signs, or street signs, reading print books, and taking part in sports as well because of decreased acuity."  Tr. 1378.  The letter does not state that Compton needs to rest his eyes at will.

As to visual impairment for the time period beginning September 1, 2003, through February 28, 2006, the ALJ stated:

> The claimant's vision problems from September 1, 2003, through February 28, 2006, do not warrant any additional limitations other than the limitation of no working with fine print that is set forth in the above residual functional capacity.  The claimant reported to his ophthalmologists that his vision fluctuates, but at no time during September 1, 2003, through February 28, 2006, did his visual acuity ever measure below 20/50 in the better of the two eyes.

Tr. 26.  The ALJ also noted that a state agency medical consultant who reviewed the records in 2004 found Compton's vision impairment "non-severe."  Tr. 28.  Accordingly, for the time period from September 1, 2003, through February 28, 2006, the ALJ's RFC assessment is supported by substantial evidence as it relates to the issue of eye fatigue.

For the time period beginning June 1, 2007, the ALJ stated:

As for the opinion evidence, Dr. Leonardy indicated on January 24, 2007, that the claimant could be expected to have easy eye fatigue and would need to rest his eyes frequently.  He further indicated that the claimant could have difficulty with fine details and/or reading, but it was not likely that he would have pain, redness, or watering of his eyes due to this condition.  (Ex. 34F).  Dr. Jack Hendershot indicated on January 22, 2007, that he treated the claimant for his cataracts and the claimant has no limitations from his cataracts (Ex. 33F).  The opinions of Dr. Leonardy and Dr. Hendershot have been given great weight as they are treating physicians and their opinions are consistent with the medical evidence of record.  The claimant's complaints of difficulty with reading fine print have been fully accounted for.

The ALJ gave great weight to the opinion of Dr. Leonardy but did not explain why he rejected Dr. Leonardy's eye fatigue limitation.[12]

"[T]he adjudicator's assessment of an individual's RFC may be the most critical finding contributing to the final determination or decision about disability."  SSR No. 96-5p, 1996 WL 374183 (July 2, 1996).  In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." SSR No. 96-8p, 1996 WL 374184 (July 2, 1996).  Moreover, the ALJ must build an accurate and logical bridge between the evidence and his conclusion.  *Fleischer v. Astrue,* 774 F. Supp. 2d 875, 877 (N.D. Ohio 201*1*). *see also Wilson v. Comm. of Soc. Sec*., 378 F.3d 541, 544-546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion).

---

[12] The ALJ also did not make sufficiently clear why Dr. Leonardy's opinion was not given controlling weight.

"Where the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Castello v. Commissioner of Social Sec.*, 5:09 CV 2569, 2011 WL 610590, at *2 (N.D. Ohio Jan 10, 2011) *(quoting Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir. 2007) (internal quotation omitted); *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir. 1995) (the ALJ's analysis must allow reviewing court to trace the path of his reasoning) (Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review").

While the ALJ's findings may be supported by substantial evidence in the record, the Court cannot make that determination because the ALJ failed to sufficiently explain why the eye fatigue limitation suggested by Dr. Leonardy was not included in the RFC assessment for the period beginning June 1, 2007 (Finding No. 29), thus preventing meaningful review.  For this reason the Commissioner's decision should be reversed and the case remanded for the limited purpose of addressing treating physician reports regarding Compton's eye fatigue as it relates to the RFC assessment for the period beginning June 1, 2011.

**Peripheral Vision.**  To support his contention of the need for a limitation based on no peripheral vision beyond 30 degrees, Compton relies on two letters:  (1) a September 4, 2008, letter, from Dr. Dabbs stating that Compton "probably has some limitation of peripheral visual fields secondary to retinal ischemia and laser photocoagulation treatment (Tr. 1534);"  and (2) a July 27, 2011, letter from Dr. Hendershot, in which Dr. Hendershot states, "laser treatment…limited [Compton's] peripheral visual field to a central 30 degrees in each eye (Tr. 1705).[13]"  The ALJ specifically cited both letters in her decision.  (Tr. 36, 38).  The ALJ stated

---

[13] Both of these letters are from the time period beginning June 1, 2007.

that Dr. Hendershot was a treating source but failed to explain why she rejected a peripheral

vision limitation in the RFC.

The Commissioner argues that, even assuming a well-documented peripheral vision

limitation, Compton cannot show that all of the jobs enumerated by the VE would be eliminated.

Doc. 17, p. 14.  Turning to the VE testimony, the VE testified that Compton could perform three

jobs:  stock checker, wire cutter, and laundry worker.  Tr. 1794-95.  When the VE factored in a

peripheral vision limitation, it eliminated one out of the three jobs, i.e., stock checker.  Tr. 1795-

98.  Thus, even with a peripheral vision limitation, the remaining two jobs, i.e., wire cutter and

laundry worker, constitute a significant number, i.e., 930,000 jobs at the national level.  *Nejat v.*

*Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (2000 jobs found to be a significant

number after eliminating two out of the three jobs the VE testified that claimant could perform).

Accordingly, even if it was error for the ALJ to fail to include in the RFC a peripheral vision

limitation it was a harmless error.

### 3.  Additional RFC Challenges

Compton also argues that the ALJ failed to adopt in her hypothetical and RFC findings

No. 8 and 29, the following three limitations:  (a) the need to avoid contact with moving

machinery, sharp objects, dangerous or exposed heights, and uneven surfaces (since Compton is

taking the blood thinner Coumadin); (b) the need to avoid being in close proximity to the general

public and avoid pollutants and irritants (because Compton is on immunosuppressant

medications); and (c) the ability to elevate his feet from time to time in the work setting to bring

edema down.  Doc. 16, p. 22.

Plaintiff's argument lacks merit because "[h]ypothetical questions . . . need only

incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec.*

25

*Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  The ALJ's credibility determinations are entitled to great deference because the ALJ had the "unique opportunity to observe" the witness's demeanor while testifying. *Buxton,* 246 F.3d at 773; *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 476; *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531.

The claimant bears the burden of proving the existence and severity of limitations caused by his impairments. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  Compton does not cite to any medical opinions that support the severity of these limitations in the working environment.  To the contrary, the ALJ found,

> Overall the claimant's level of activity is inconsistent with a claim of not being able to do any work.  The claimant indicated on October 23, 2007, that he was able to shop for groceries assist with chores at home, and assist with the care of his brother who has cerebral palsy and is in a wheelchair (Ex. 10E).  He also indicated that he is able to drive vision permitting (Ex. 10E, p. 3)…He also takes family vacations, including frequent trips to Lake Cumberland.  There is even evidence that the claimant has continued to work while at Lake Cumberland even though he testified that he stopped working in 1998…In July 2008, the claimant report to Dr. Dabbs that he was doing work around the marina.

Tr. 39.  Compton's argument that the ALJ's RFC assessment, at findings No. 8 and No. 29, is not supported by substantial evidence because it failed to include limitations for working with the public, working with dangerous machinery, and elevating his feet is without merit.

**B.  The ALJ did not fail to accurately summarize facts**

Compton argues that the ALJ decision sets forth numerous statements of fact that are "simply wrong-inaccurate."  Doc. 16, p. 27.  In support, however, Compton only cites one inaccuracy.  In the ALJ's decision she stated that Compton did not meet Listing 6.00(E)(2) because "within 12 months after claimant had a kidney and pancreas transplant, he was not experiencing any rejection episodes or renal infections."  Tr. 20.  Later in the decision, consistent

with the medical evidence, the ALJ correctly stated that Compton had two episodes of rejection within the first two months.  Tr. 22.  Compton states, "[i]f this was one instance, counsel would assume it was a mistake, but unfortunately, the decision is loaded with these incorrect statements and assumptions."  Doc. 16, p. 28.  However, as Compton does not point to any other incorrect statements, it can be assumed that this was a mistake.  Furthermore, Listing 6.00(E)(2) provides that, after a kidney transplantation, a claimant should be considered under a disability for 12 months.  Because the Agency did find Compton to be under a disability for the 12 months following his surgery, this error did not affect his disability determination.  20 C.F.R. § 404 app. 1.

### C.  The ALJ did not deprive Compton of due process of law

Compton argues that his counsel was not provided a full opportunity to question the VE and, therefore, his procedural due process rights under the 5th Amendment to the U.S. Constitution were violated.  Doc. 16, pp. 30-31.   Compton claims that his counsel was only able to ask two questions before being "effectively shut down" by the ALJ.  Id. Compton argues that his counsel was unable to inquire into numbers, sources, methodology, and more with regard to the VE's answers.  Id.  Compton cites *McLaughlin* to support his assertion that, because the ALJ "curtail[ed] counsel," there was reversible error.  *McLaughlin v. Sec'y of Health, Ed. & Welfare of U. S., 612 F.2d 701, 703 (2d Cir. 1980).*  Compton's claim is without merit.

The claimant in *McLaughlin* asked a medical examiner specific follow up questions about myelography,[14] but the ALJ refused to let any of the questions be asked and stated, "But it (myelography) hasn't been used in your case."  *McLaughlin*, 612 F.2d at 703.  The Second

---

[14] "Myelography is… injection of a radio-opaque substance into the fluid in the spinal column with subsequent X-ray examination of the spine at different levels by tilting the table on which the patient lies."  *McLaughlin v. Sec'y of Health, Ed. & Welfare of U. S.*, 612 F.2d 701, 703 (2d Cir. 1980)

Circuit found that this issue was at the heart of the case and remanded the case for the limited purpose of permitting cross-examination of the medical examiner on the subject of myelography. *Id.*

In contrast, ALJ Vittelio, who conducted Compton's most recent hearing, did not refuse to permit Compton's counsel to question the VE.  Compton states that his counsel asked only two questions because the ALJ kept saying, "that is it counsel, right" and counsel felt like the ALJ was "on his back."  Doc. 16, p. 30.  Compton does not argue that the ALJ refused to permit the witness to answer counsel's questions.  Accordingly, *McLaughlin* is distinguishable.

After the ALJ finished questioning the VE, the ALJ stated that she was giving Compton a month to provide additional medicals and asked counsel if that was okay.  Tr. 1797.  The ALJ stated, "Is that-you're good with that, Counselor?"  Tr. 1797.  Compton's counsel stated, "I am, Your Honor.  I do have a question."  Tr. 1797.  Compton's counsel proceeded to ask two questions that the VE answered.  Tr. 1797-98.  Then the ALJ stated, "Okay. I think we have it all, Counselor.  Four weeks to get the medical, okay?"  To which Compton's counsel responded, "Yes, Your Honor."  Compton's counsel did not indicate to the ALJ that he had any additional questions for the witness.  Accordingly, neither Plaintiff's brief nor a reading of the hearing transcripts shows any basis for finding that Compton's due process rights were violated. *Berkowski v. Comm'r of Soc. Sec.*, 652 F. Supp. 2d 846, 861 (E.D. Mich. 2009).

### D.  Remaining Arguments

This Report and Recommendation does not address Compton's remaining arguments that the ALJ failed to properly apply the treating physician rule and that the ALJ wrongly determined Plaintiff has no new impairments and/or increased severity of impairments after June 1, 2007, as the reversal and remand of the Commission's decision has been recommended, in part, on other

grounds.  Resolution of these other grounds may impact the treating physician issue and the finding that Compton had no new impairments and/or increased severity of impairments after June 1, 2007.  Therefore, it is not necessary for the Court to address the remaining arguments. *Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

### VII.  Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED.**[15]

Dated:  January 13, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[15] The recommendation to remand is not a determination by the undersigned that Compton is disabled during any of the relevant time periods.